O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JEFFERY DALE KIVETT,[1]          )  Case No. EDCV 13-0013-JPR
                                 )
                Plaintiff,       )
                                 )  MEMORANDUM OPINION AND ORDER
          vs.                    )  AFFIRMING THE COMMISSIONER
                                 )
CAROLYN W. COLVIN, Acting        )
Commissioner of Social           )
Security,[2]                     )
                                 )
                Defendant.       )
                                 )

I.   PROCEEDINGS

     Plaintiff seeks review of the Commissioner's final decision
denying his application for Supplemental Security Income benefits
("SSI").  The parties consented to the jurisdiction of the
undersigned U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(c).

_____

     [1]     The parties have spelled Plaintiff's first name at
various times as "Jeffery" and "Jeffrey," and the medical records
similarly use both spellings.  On January 11, 2013, Plaintiff
filed a Notice of Correction of Spelling of Name (Amended),
clarifying that "Jeffery" is the proper spelling.

     [2]     On February 14, 2013, Colvin became the Acting
Commissioner of Social Security.  Pursuant to Federal Rule of
Civil Procedure 25(d), the Court therefore substitutes Colvin for
Michael J. Astrue as the proper Respondent.

1

This matter is before the Court on the parties' Joint
Stipulation, filed August 23, 2013, which the Court has taken
under submission without oral argument.  For the reasons stated
below, the Commissioner's decision is affirmed and this action is
dismissed.

**II.  BACKGROUND**

Plaintiff was born on November 6, 1959.  (Administrative
Record ("AR") 74.)  He completed 10th grade but did not graduate
from high school, and his ability to read and write is limited.
(AR 447, 461.)  He previously worked as a construction laborer.
(AR 441-42, 470-72.)  He has a history of drug use, and he was
incarcerated from 2005 to 2009 for selling methamphetamine.  (AR
452-53.)  He testified at the hearing that he had not used drugs
since his conviction.  (AR 452.)

On February 3, 2010, Plaintiff filed applications for Social
Security disability insurance benefits ("DIB") and SSI.  (See AR
74-77, 84-91, 425-28.)  He alleged that he had been unable to
work since June 1, 1998, because of diabetes, lack of feeling in
his feet, poor vision, and bleeding ulcers.  (AR 74, 80, 85.)  He
subsequently amended the alleged disability onset date to
February 3, 2010, and withdrew his request for DIB.  (AR 436-37.)

After Plaintiff's applications were denied, he requested
reconsideration.  (AR 27.)  They were again denied, after which
he requested a hearing before an ALJ.  (AR 30-31, 35-36.)  A
hearing was held on August 2, 2011, at which Plaintiff, who was
represented by counsel, appeared and testified, as did a
vocational expert and medical expert Dr. Samuel Landau.  (AR 432-
53.)  In a written decision issued August 5, 2011, the ALJ

1  determined that Plaintiff was not disabled.  (AR 11-21.)  On

2  November 6, 2012, the Appeals Council denied his request for

3  review.  (AR 3-7.)  This action followed.

4  **III. STANDARD OF REVIEW**

5       Pursuant to 42 U.S.C. § 405(g), a district court may review

6  the Commissioner's decision to deny benefits.  The ALJ's findings

7  and decision should be upheld if they are free of legal error and

8  supported by substantial evidence based on the record as a whole.

9  Id.; Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420,

10  1427, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481 F.3d 742, 746

11  (9th Cir. 2007).  Substantial evidence means such evidence as a

12  reasonable person might accept as adequate to support a

13  conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue,

14  504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla

15  but less than a preponderance.  Lingenfelter, 504 F.3d at 1035

16  (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir.

17  2006)).  To determine whether substantial evidence supports a

18  finding, the reviewing court "must review the administrative

19  record as a whole, weighing both the evidence that supports and

20  the evidence that detracts from the Commissioner's conclusion."

21  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1996).  "If the

22  evidence can reasonably support either affirming or reversing,"

23  the reviewing court "may not substitute its judgment" for that of

24  the Commissioner.  Id. at 720-21.

25  **IV.  THE EVALUATION OF DISABILITY**

26       People are "disabled" for purposes of receiving Social

27  Security benefits if they are unable to engage in any substantial

28  gainful activity owing to a physical or mental impairment that is

3

expected to result in death or which has lasted, or is expected to last, for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.   <u>The Five-Step Evaluation Process</u>

The ALJ follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. § 416.920(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied.  § 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied.  § 416.920(a)(4)(ii).  If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded. § 416.920(a)(4)(iii).  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional

4

1  capacity ("RFC")[3] to perform his past work; if so, the claimant
2  is not disabled and the claim must be denied.
3  § 416.920(a)(4)(iv).  The claimant has the burden of proving that
4  he is unable to perform past relevant work.  <u>Drouin</u>, 966 F.2d at
5  1257.  If the claimant meets that burden, a prima facie case of
6  disability is established.  <u>Id.</u>  If that happens or if the
7  claimant has no past relevant work, the Commissioner then bears
8  the burden of establishing that the claimant is not disabled
9  because he can perform other substantial gainful work available
10  in the national economy.  § 416.920(a)(4)(v).  That determination
11  comprises the fifth and final step in the sequential analysis.
12  § 416.920; <u>Lester</u>, 81 F.3d at 828 n.5; <u>Drouin</u>, 966 F.2d at 1257.
13      B.   <u>The ALJ's Application of the Five-Step Process</u>
14      At step one, the ALJ found that Plaintiff had not engaged in
15  any substantial gainful activity since February 3, 2010.  (AR
16  13.)  At step two, she concluded that Plaintiff had severe
17  impairments of "poorly controlled diabetes mellitus," gastritis,
18  and esophagitis.  (AR 14.)  She determined that Plaintiff's
19  hypertension, "non-obstructing right kidney stone," "right renal
20  calculus," "tobacco dependence," and history of methamphetamine
21  abuse were nonsevere.  (<u>Id.</u>)  The ALJ further found that
22  Plaintiff had not established through objective evidence a
23  medically determinable ailment of peripheral neuropathy.  (<u>Id.</u>)
24  At step three, she determined that his impairments did not meet
25  or equal any of the impairments in the Listing.  (<u>Id.</u>)  At step
26
27      [3]   RFC is what a claimant can do despite existing
28  exertional and nonexertional limitations.  § 416.945; <u>see</u> <u>Cooper</u>
   <u>v. Sullivan</u>, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

1   four, she found that Plaintiff retained the RFC to perform "less
2   than a full range of light work," with certain additional
3   limitations.  (Id.)  Based on the VE's testimony, the ALJ
4   concluded that Plaintiff could not perform his past work as a
5   construction worker as generally or actually performed.  (AR 18-
6   19.)  At step five, she concluded that he was not disabled under
7   the framework of the Medical-Vocational Guidelines, 20 C.F.R.
8   Part 404, Subpart P, Appendix 2, and that jobs existed in
9   significant numbers in the national economy that Plaintiff could
10  perform.  (AR 19-20.)  Accordingly, the ALJ determined that
11  Plaintiff was not disabled.  (AR 20.)

12  **V.   RELEVANT FACTS**

13       A.   Medical Records

14       On January 29, 2009,[4] Plaintiff was seen at the emergency
15  room of Oklahoma University Medical Center with complaints of
16  abdominal pain, nausea, and "blood-tinged" vomiting.  (AR 175,
17  181.)  He was reported to have a past history of diabetes
18  mellitus and peptic ulcer.  (AR 175.)  He was noted to be
19  suffering from moderate dehydration, severe hyperglycemia, and
20  moderate leukocytosis[5] and was admitted for observation.  (AR

21  _____

22       [4]   Plaintiff's 2009 medical records predate the amended
    alleged onset date of February 3, 2010; however, as these records
23  were discussed at the hearing and in the ALJ's decision, they are
    detailed here.  See Williams v. Astrue, 493 F. App'x 866, 868
24  (9th Cir. 2012) (noting that although medical opinions that
    predate alleged onset of disability are of limited relevance, ALJ
25  must consider all medical-opinion evidence (quoting Carmickle v.
    Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1165 (9th Cir. 2008))).

27       [5]   Leukocytosis is an abnormally large number of
    leukocytes, or white blood cells, and is observed in cases of
28  acute infection, inflammation, hemorrhage, and other conditions.

177.)  Plaintiff was given an MRI and treated with IV fluids, an IV antiemetic, and Zophran[6] to prevent nausea and vomiting; he also received morphine, Lantus,[7] and insulin.  (AR 179-80.)  On January 30, 2009, he was able to tolerate a full ADA diet,[8] and laboratory studies showed resolution of his anion gap,[9] improvement of his glucose level, and improvement of his blood-urea-nitrogen and creatinine levels.  (AR 181.)  A chest x-ray performed that day showed no abnormalities in Plaintiff's heart or lungs.  (AR 208.)  Plaintiff was discharged that day with a

See Stedman's Medical Dictionary 991 (27th ed. 2000).

[6]     Zofran is the brand name for ondansetron, used to prevent nausea and vomiting.  See Ondansetron, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601209.html (last updated Nov. 15, 2011).

[7]     Lantus is the brand name for insulin glargine, a long-acting synthetic version of human insulin.  See Insulin Glargine (rDNA origin) Injection, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a600027.html (last updated Feb. 15, 2012).

[8]     The term "ADA diet" refers to dietary guidelines established by the American Diabetes Association, or ADA, to assist diabetics in maintaining normal blood-sugar levels.  See generally Irl B. Hirsch, The Death of the "1800-Calorie ADA Diet," Clinical Diabetes, Apr. 2002, at 51-52, available at http://clinical.diabetesjournals.org/content/20/2/51.full.  The ADA has clarified that each diabetic must tailor his diet to his individual needs, thus dispelling the notion that a single ADA diet accommodates all diabetics.  See The "ADA Diet" Myth, Diabetes Forecast, Mar. 2011, available at http://www.diabetes forecast.org/2011/mar/the-ada-diet-myth.html.  The ADA diet continues to be used as a benchmark in the treatment of diabetic patients admitted to the hospital.  See Hirsch, supra, at 51-52.

[9]     Anion gap is a calculation of "the difference between the sum of the measured cations and anions in the plasma or serum."  Stedman's Medical Dictionary, supra, at 730.  An elevated anion gap may indicate diabetic or lactic acidosis.  Id.

7

prescription for Phenergan[10] "for persistent nausea" and orders to continue his Lantus prescription, continue checking his blood sugar, and adhere to a sliding-scale insulin regimen. (AR 182.) The discharge diagnoses included "nausea and vomiting, resolved," "abdominal pain, resolved," "hyperglycemia, resolved," "elevated Anion gap/metabolic acidosis, resolved," "uncontrolled diabetes type 2," and "leukocytosis, improved." (AR 181.)

On January 31, 2009, Plaintiff returned to the emergency room at OU Medical Center with complaints of vomiting, nausea, and abdominal pain. (AR 183.) A CT scan of Plaintiff's abdomen and pelvis revealed possible esophagitis but was otherwise normal. (AR 206.) A chest x-ray was also normal. (AR 209.) Plaintiff's extremities "exhibit[ed] normal ROM," or range of motion, and he had "[n]o lower extremity edema"; further, he had no motor or sensory deficit. (AR 184.) An electrocardiogram, or ECG, revealed sinus tachycardia but was otherwise normal. (AR 214.) Plaintiff was treated with IV fluids, Zofran, morphine, and Phenergan and released. (AR 187, 188.)

On September 3, 2009, Plaintiff was seen at the OU Medical Center emergency room with complaints of vomiting blood, black stools, nausea, chronic diarrhea, and abdominal pain. (AR 189.) Plaintiff also complained of difficulty breathing. (Id.) He was admitted, intubated, and treated with morphine, Zofran,

---

[10]    Phenergan is a brand name for promethazine, whose uses include relaxation and sedation, control of nausea and vomiting, and pain relief. See Promethazine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682284.html (last updated Jan. 1, 2011).

Protonix,[11] and regular insulin.  (AR 194.)  A chest x-ray conducted on September 4, 2009, revealed symptoms consistent with chronic obstructive pulmonary disease.  (AR 211.)  A renal ultrasound conducted the same day was normal.  (AR 212.)  A history and physical report dated September 4, 2009, reflected past diagnoses of diabetes, peptic ulcer disease, and hypertension.  (AR 197.)  Plaintiff's then-current medications were reported to include Lantus, regular insulin, clonidine,[12] Reglan,[13] loperamide,[14] and loratidine.[15]  (AR 197-98.)  Plaintiff exhibited normal range of motion and no edema in his extremities. (AR 190.)  He had no motor or sensory deficit and normal reflexes.  (Id.)

On September 7, 2009, Plaintiff was discharged.  (AR 200.)

---

[11]    Protonix is a proton pump inhibitor, or "PPI."  Laura Dean, Comparing Proton Pump Inhibitors, PubMed Health (Oct. 1, 2010), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0004954/. PPIs are medications that block gastric acid production.  Id.

[12]    Clonidine is used to treat high blood pressure.  See Clonidine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a682243.html (last updated Oct. 1, 2010).

[13]    Reglan is a brand name for metoclopramide, used to relieve heartburn, speed healing of esophageal sores and ulcers, and relieve symptoms caused by slow stomach emptying in diabetics.  See Metoclopramide, MedlinePlus, http://www.nlm.nih. gov/medlineplus/druginfo/meds/a684035.html (last updated Sept. 1, 2010).

[14]    Loperamide is a nonprescription medication used to control diarrhea.  See Loperamide, MedlinePlus, http://www.nlm. nih.gov/medlineplus/druginfo/meds/a682280.html (last updated Aug. 1, 2010).

[15]    Loratadine is used to treat hayfever symptoms.  See Loratadine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a697038.html (last updated Oct. 1, 2010).

The discharge summary noted that Plaintiff was presumed to be suffering an upper gastrointestinal bleed at the time of admission and was therefore limited to IV ingestion and given Protonix and antiemetics.  (Id.)  A gastrointestinal specialist suspected Plaintiff might be suffering from esophagitis, but the attending physician chose to delay an upper endoscopy, "instead opting for conservative management while evaluating whether further bleeding was occurring."  (Id.)  Plaintiff was also treated for hypoglycemia and diabetic ketoacidosis.  (Id.)  Plaintiff was noted to have a "good" condition at the time of discharge and was instructed to continue with insulin, Protonix, Lantus, and dextrose by IV and to adhere to a diabetic diet.  (Id.)  A follow-up visit after two weeks was recommended.  (Id.)

On September 8, 2009, Plaintiff was seen by Drs. Jessica Philpott and Jeremy Moad for a gastrointestinal consult.  (AR 203.)  The doctors recommended a high-dose proton pump inhibitor, multiple fluid boluses,[16] and an insulin drip.  (Id.)  They also anticipated that Plaintiff might need an upper endoscopy to determine whether his gastrointestinal symptoms were attributable to peptic ulcer disease, esophagitis, or gastritis.  (Id.)

On December 25, 2009, Plaintiff was seen at the emergency room of St. Mary Medical Center in Apple Valley for complaints of nausea, vomiting, and abdominal pain and was admitted for "diabetic vomiting."  (AR 228-29.)  He was noted not to be at risk for falls (AR 231), with "motor and sensory grossly intact" (AR 240).  A CT scan the same day of Plaintiff's abdomen and

---

[16]    A bolus dose indicates a relatively large quantity. Stedman's Medical Dictionary, supra, at 222.

pelvis revealed a "[t]iny hiatal hernia" and a nonobstructing kidney stone. (AR 246, 248.) On December 27, 2009, gastroenterology specialist Dr. Neera Grover examined Plaintiff and noted his "uncontrolled diabetes" but resolving symptoms. (AR 242.) On December 28, 2009, Dr. Grover performed an upper endoscopy to rule out peptic ulcer disease and gastroesophageal reflux disease. (AR 243-44.) The exam revealed "mild to moderate antral gastritis," a hiatal hernia, and "grade 2 to 3 linear erosive esophagitis." (AR 245.) Dr. Grover obtained biopsies during the exam. (Id.) She thereafter ordered that Plaintiff could "resume diet" and prescribed Protonix, Carafate,[17] and Reglan. (AR 245.) An abdominal ultrasound was normal. (AR 247.)

On December 29, 2009, Plaintiff was discharged. (AR 237.) Plaintiff was noted to be "doing better" after his consultation with Dr. Grover. (Id.) He was instructed to maintain an 1800-calorie ADA diet, continue with Protonix and his "regular other home medications," follow up with his primary-care physician in one week, and follow up with a gastrointestinal specialist in two weeks. (Id.)

On March 15, 2010, Plaintiff was seen by Michael Avila, a certified physician assistant, for complaints of "pain [in] both feet," abdominal pain with vomiting, and two weeks of diarrhea, as well as for a consultation on Plaintiff's medications. (Ex.

---

[17]   Carafate is a brand name for sucralfate, used to treat and prevent peptic ulcers. See Sucralfate, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681049.html (last updated Aug. 15, 2013).

5F at 2.)[18]  Plaintiff's current medications were noted to include Lantus and Neurontin.  (Id.)  Although Mr. Avila noted no abnormalities in Plaintiff's extremities and full range of motion, he found "gross sensory deficit" and "[bilateral] plant[a]r feet non discriminate sharp/dull."  (Id.)  He assessed Plaintiff as having diabetes mellitus type 2 with neuropathy in both feet.  (Id.)  It appears that Plaintiff was prescribed Lantus, "regular insulin," a glucometer with lancet and a 30-day supply of chemsticks, as well as gabapentin.[19]  (Id.)  Mr. Avila ordered testing, including a complete blood count, comprehensive metabolic panel, thyroid-stimulating hormone test, albumin/globulin ratio test, and urinalysis.  (Id.)  He noted that Plaintiff should monitor his fasting blood sugar, decrease his intake of carbohydrates, increase his intake of protein, and return in one month to follow up.  (Id.)

On April 6, 2010, Plaintiff was seen by Dr. Damayanthi Seneviratne to follow up regarding the results of Plaintiff's bloodwork.  (AR 262.)  Plaintiff's current medications were noted to include Lantus and Neurontin.  (Id.)  Dr. Seneviratne's notes are largely illegible; however, he noted Plaintiff's complaint

---

[18]   Exhibit 5F does not bear an Administrative Record page number.  It is located between AR 250 and AR 253.

[19]   Gabapentin is a prescription medication "sometimes used to relieve the pain of diabetic neuropathy."  See Gabapentin, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html (last updated July 15, 2011).  The brand names for gabapentin include Neurontin (id.), which Plaintiff testified he had taken to treat peripheral neuropathy (AR 455) and prescriptions for which are reflected in the medical records (see, e.g., AR 261, 262).

that his vision was "deteriorating" and wrote "vision impaired"
and "peripheral neuropathy," apparently as complications of
Plaintiff's diabetes mellitus.  (Id.)

On April 13, 2010, Plaintiff again was seen by Dr.
Seneviratne for a complaint of high blood sugar and a general
medical consult.  (Ex. 5F at 1.)  Plaintiff's current medications
were noted to include Lantus, Neurontin, and regular insulin.
(Id.)  Dr. Seneviratne's assessment of Plaintiff included
"uncontrolled [diabetes mellitus]" and "peripheral neuropathy."
(Id.)  Dr. Seneviratne's notes appear to have prescribed an
increase in Plaintiff's Lantus intake and to have recommended
that Plaintiff's blood sugar be checked twice daily.[20]  (Id.)

On April 29, 2010, Plaintiff was seen by Dr. Seneviratne for
a consultation on his medications, which were noted to include
Lantus, Neurontin, and regular insulin.  (AR 261.)  Dr.
Seneviratne appears to have noted minimally decreased tone and
sensation on the part of the form for neurological assessment and
to have assessed diabetes mellitus with peripheral neuropathy.
(Id.)  Dr. Seneviratne also appears to have noted that Plaintiff
had been compliant and that his blood sugar readings "have
improved"; he renewed Plaintiff's medications.  (Id.)  Dr.
Seneviratne's last note regarding Plaintiff's peripheral
neuropathy is largely illegible, but he appears to have
recommended Neurontin twice daily.  (Id.)

---

[20]   "Bid," which Dr. Seneviratne wrote, is an abbreviation
of the Latin expression "bis in die," meaning twice a day.  See
Bid Definition, Merriam-Webster Dictionary, www.merriam-
webster.com/dictionary/bid (last visited Oct. 28, 2013).

13

On June 6, 2010, Plaintiff was seen in the emergency room of St. Mary Regional Medical Center for complaints of nausea and vomiting.  (AR 301.)  Plaintiff said that he had been "working outside in the heat" when the nausea and vomiting began and that these symptoms had continued for two days.  (Id.)  Plaintiff was admitted with "[d]ehydration with nonketotic hyperosmolar hyperglycemia."[21]  (Id.)  At the time of admission, lab data showed Plaintiff's glucose to be 497[22] and his bicarbonate level to be 16.[23]  (AR 306.)  A "limited" chest x-ray was reported to show no abnormalities in Plaintiff's lungs or heart.  (AR 305.) He was treated with IV fluids, insulin, and Protonix, and his condition "rapidly improved."  (AR 303, 306-07.)  Once again, he was noted not to be at risk of falling (AR 361), and he had "no

---

[21]    "Diabetic hyperglycemic hyperosmolar syndrome (HHS) is a complication of type 2 diabetes that involves extremely high blood sugar (glucose) levels without the presence of ketones. Ketones are byproducts of fat breakdown."  Diabetic hyperglycemic hyperosmolar syndrome, MedlinePlus, http://www.nlm.nih.gov/ medlineplus/ency/article/000304.htm (last updated June 12, 2012).

[22]    Target blood glucose levels for people with diabetes are between 70 and 130 mg/dL before meals and below 180 mg/dL one to two hours after the start of a meal.  See Prevent diabetes problems: Keep your diabetes under control, Nat'l Diabetes Information Clearinghouse (NDIC), http://diabetes.niddk.nih.gov/ dm/pubs/complications_control/#numbers (last updated Aug. 8, 2013).  Hyperglycemia, or high blood sugar, begins to cause symptoms when glucose values become "significantly elevated," exceeding 200 mg/dL.  Hyperglycemia in diabetes, Mayo Clinic, http://www.mayoclinic.com/health/hyperglycemia/DS01168/ METHOD=print (last updated June 14, 2012).

[23]    The normal blood bicarbonate range is 23-29 mEq/L (milliequivalent per liter).  $CO_2$ blood test, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/003469.htm (last updated Apr. 29, 2012).  Lower than normal levels of bicarbonate can be a sign of ketoacidosis, among other ailments.  Id.

14

focal deficit" with "fairly well preserved" "[m]otor tone" (AR 366).

On June 7, 2010, Plaintiff's anticipated discharge was delayed by his resumed nausea and vomiting. (AR 301.) Because Plaintiff "was noted to have several episodes of coffee-ground emesis"[24] following admission, a consultation with a gastrointestinal specialist was ordered. (AR 308.) An upper endoscopy showed evidence of acute gastritis, a Mallory-Weiss tear,[25] a possible benign gastric polyp, and a hiatal hernia. (AR 301, 311, 323.) The Mallory-Weiss tear was treated with injections of epinephrine, which was noted to effectively address bleeding in the area. (AR 312.) Lab tests confirmed that the probable polyp was benign. (AR 313.)

On June 8, 2010, Plaintiff was noted to have "developed a low-grade fever" overnight. (AR 321.) He was also noted to have continued nausea, vomiting, and diarrhea. (Id.) Plaintiff was to be tested for a bacterial infection, undergo an abdominal ultrasound "to rule out gallstones," undergo an abdominal CT scan "to rule out obstruction," and be tested to confirm the levels of

---

[24]   "Hematemesis is the vomiting of blood, which may be obviously red or have an appearance similar to coffee grounds." See H. Kenneth Walker, W. Dallas Hall & J. Willis Hurst, Clinical Methods: The History, Physical, and Laboratory Examinations 439 (3d ed. 1990), available at http://www.ncbi.nlm.nih.gov/books/NBK411/.

[25]   A Mallory-Weiss tear is a tear in the mucus membrane of the lower esophagus or upper stomach near where the organs join. See Mallory-Weiss tear, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/000269.htm (last updated Nov. 11, 2010). Such tears "are usually caused by forceful or long-term vomiting or coughing." Id.

amylase and lipase in his blood.  (AR 321-22.)  He had no cyanosis of the extremities.[26]  (AR 371.)  His prognosis was reported to be "guarded."  (AR 322.)

The same day, a CT scan of Plaintiff's abdomen and pelvis showed evidence of subsegmental atelectasis,[27] a "small hiatal hernia," and "[a] 2 mm, nonobstructing stone" in Plaintiff's right kidney.  (AR 333.)  Plaintiff's other visible organs appeared normal.  (Id.)  A "limited" abdominal ultrasound also was reported to be normal.  (AR 336.)

On June 9, 2010, Plaintiff was reported to be in sinus rhythm, tolerating clear liquids, and not having any nausea or vomiting.  (AR 382.)  An imaging report dated June 10, 2010, showed that Plaintiff's "lungs and pleura are clear" and his "heart and mediastinum are normal."  (AR 332.)

Plaintiff was discharged on June 11, 2010.  Discharge notes reflect that he was treated with PPIs and Carafate.  (AR 301.) He was advised to avoid alcohol and nonsteroidal anti-inflammatory drugs,[28] limit his diet to 1800 calories a day, and follow up within a week with his primary-care physician.  (AR

---

[26]    Cyanosis is a discoloration of the skin arising from poor circulation.  See Skin discoloration - bluish, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/003215.htm (last updated Apr. 21, 2013).

[27]    Subsegmental atelectasis is partial collapse of the lung.  Stedman's Medical Dictionary, supra, at 160.

[28]    Nonsteroidal anti-inflammatory drugs, or NSAIDs, relieve pain by blocking the production of pain-signaling molecules.  See Laura Dean, Comparing NSAIDs, PubMed Clinical Q&A (May 1, 2011), http://www.ncbi.nlm.nih.gov/books/NBK45590/. Common NSAIDs include aspirin and ibuprofen.  Id.

301-02.)

On June 15, 2010, Plaintiff was seen by Dr. Seneviratne. (AR 275.)  Plaintiff was noted to have been admitted to St. Mary Medical Center on June 6, 2010, and to be complaining of fatigue, headache, and weakness.  (Id.)  This record is largely illegible but reflects further notes regarding Plaintiff's endoscopy and diabetes.  (Id.)

On October 10, 2010, Plaintiff was seen by a certified physician assistant for a consultation regarding his medications. (AR 349.)  He was noted to have diabetes mellitus and "neuropathy lower legs."  (Id.)  The remainder of the examining provider's notes are largely illegible.

On November 10, 2010, Plaintiff was seen by Dr. Seneviratne for complaints of fatigue and stomach pain.  (AR 350.)  His notes appear to state that Plaintiff's feet were cold to the touch and that he experienced decreased sensation.  (Id.)  The notes appear further to state that Plaintiff suffers from diabetes mellitus, "not controlled," and peripheral neuropathy.  (Id.)  Plaintiff was instructed to check his blood sugar twice daily and provide the readings, and he was referred to a podiatrist.  (Id.)

On March 6, 2011, Plaintiff was seen in the emergency room of St. Mary Regional Medical Center for complaints of nausea, vomiting, and abdominal pain lasting two days.  (AR 281.)  He was found to have "a very elevated glucose of 345," "a bicarb of 14," "a high anion gap metabolic acidosis," and leukocytosis and was admitted for diabetic ketoacidosis.  (Id.)  His chart notes additional "[d]iagnoses" of nausea, vomiting, and "right renal calculus."  (Id.)  Plaintiff was noted to have undergone a CT

17

scan of his abdomen and pelvis and a chest x-ray.  (AR 408.)
Plaintiff "responded well to IV fluids," insulin, and Levaquin[29]
and was discharged on March 9, 2011, at which point he tolerated
solid food and had stable vital signs.  (AR 281.)  Plaintiff was
instructed to adhere to a "low fat, low salt, ADA 2000
kilocalorie per day diet" and to meet with his primary-care
physician within two weeks.  (Id.)  Once again, Plaintiff was
noted to have no cyanosis of the extremities.  (AR 407.)

On March 15, 2011, Plaintiff was seen by Dr. Seneviratne for
complaints of stomach pain and inability to control his blood
sugar, problems that reportedly had lasted three to four weeks.
(AR 351.)  Dr. Seneviratne's notes are largely illegible but
appear to pertain to Plaintiff's blood sugar and abdominal
issues.  No mention of peripheral neuropathy is evident.  (Id.)

On April 27, 2011, Plaintiff was seen by Dr. Seneviratne for
complaints of black toes lasting 10 days, feeling of numbness
lasting 20 days, and "really high" blood sugar lasting 20 days.
(AR 352.)  Dr. Seneviratne's notes are largely illegible, but he
appears to have noted swelling in Plaintiff's lower extremities,
and his assessment reflects at least a suspicion of "cellulitis"
and a prescription.  (Id.)

On May 4, 2011, Plaintiff was seen by Dr. Seneviratne to
consult regarding his medications and to address paperwork.  (AR
354.)  Dr. Seneviratne noted "bilateral [decreased] sensation of

---

[29]     Levaquin is the brand name for the antibiotic
levofloxacin.  See Levofloxacin, MedlinePlus, http://www.nlm.nih.
gov/medlineplus/druginfo/meds/a697040.html (last updated Sept.
15, 2013).

both feet" and peripheral neuropathy.  (Id.)  The same day, Dr.
Seneviratne handwrote the following on a prescription pad:

> To whom it may concern
>
> Mr. Kivett has uncontrolled Diabetes Mellitus
>
> His blood sugars are Very High and we are working
>
> on him to control his Diabetes
>
> Thanks
>
> [Signature]

(AR 279.)

Plaintiff was admitted to St. Mary Medical Center on July
19, 2011.  (AR 423.)  On July 21, 2011, Plaintiff was discharged
with prescriptions for Protonix, lisinopril,[30] and
ciprofloxacin.[31]  (AR 422.)  Plaintiff was instructed to maintain
a salt-restricted diet and to follow up with a physician within a
week.  (Id.)

---

[30]   Lisinopril is used to treat high blood pressure.  See
Lisinopril, MedlinePlus, http://www.nlm.nih.gov/medlineplus/
druginfo/meds/a692051.html (last updated Sept. 15, 2012).

[31]   Ciprofloxacin is used to treat or prevent certain
bacterial infections.  See Ciprofloxacin, MedlinePlus,
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a688016.html
(last updated Sept. 15, 2013).

B.  <u>Assessments of State Medical Consultants</u>

On April 22, 2010, medical consultant Dr. J. Hartman, an ophthalmologist,[32] completed a Physical Residual Functional Capacity Assessment of Plaintiff.  (AR 253-57.)  The evaluation reflects primary diagnoses of esophagitis, gastritis, and diabetes mellitus.  (AR 253.)  Dr. Hartman indicated that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday.  (AR 254.)  He noted that these restrictions "are due to abdominal pain and poorly controlled diabetes."  (<u>Id.</u>)  Dr. Hartman found that Plaintiff had not established any other limitations.  (<u>See</u> AR 254-56.)  He noted that Plaintiff's file did not include statements from Plaintiff's treating or examining medical professionals regarding his physical capacities.  (AR 257.)

Also on April 22, 2010, Dr. Hartman approved a Case Analysis based on medical evidence then in Plaintiff's file, including records of Plaintiff's admission to OU Medical Center on January 29, 2009, for complaints of nausea and vomiting; Plaintiff's treatment in the OU Medical Center emergency room on January 31, 2009, for persistent abdominal pain and vomiting; Plaintiff's admission to the OU Medical Center on September 5, 2009, for

---

[32]  Dr. Hartman's electronic signature includes a medical specialty code of 28, indicating ophthalmology.  (AR 257); <u>see</u> Program Operations Manual System (POMS) DI 26510.089, U.S. Soc. Sec. Admin. (Oct. 25, 2011), https://secure.ssa.gov/poms.nsf/ lnx/0426510090; POMS DI 26510.090, U.S. Soc. Sec. Admin. (Aug. 29, 2012), https://secure.ssa.gov/poms.nsf/lnx/0426510090.

complaints of vomiting of blood and history of peptic ulcer
disease; Plaintiff's gastrointestinal consultation on September
8, 2009; and Plaintiff's admission to St. Mary Medical Center on
December 25, 2009, for complaints of abdominal pain, vomiting,
and nausea.  (Id.)  The Case Analysis confirmed that Plaintiff's
diabetes was "not well controlled" but found "no evidence of
complications or organ damage."  (Id.)  The Case Analysis further
noted that Plaintiff's "gastritis, esophagitis, and history of
ulcer disease have not resulted in malnutrition or significant
anemia."  (Id.)  Accordingly, Plaintiff was found to "retain[]
the RFC for light work."  (Id.)

    On August 26, 2010, medical consultant Dr. G. Taylor-Holmes,
a specialist in internal medicine, performed a Case Analysis.
(AR 276.)  Dr. Taylor-Holmes noted Dr. Hartman's prior Case
Analysis and findings and reviewed additional records received
from Dr. Seneviratne's clinic.  (Id.)  Dr. Taylor-Holmes noted
"DM w/ peripheral neuropathy" based on Plaintiff's April 29,
2010, consultation with Dr. Seneviratne.  (Id.)  Dr. Taylor-
Holmes affirmed Dr. Hartman's finding that Plaintiff retained the
RFC for light work.  (Id.)

    C.   Hearing Testimony

    At the August 2, 2011 hearing before the ALJ, Plaintiff
testified that he completed 10th grade but left high school
during his 11th-grade year.  (AR 447.)  Plaintiff stated that he
completed his high-school coursework through the special-
education program because of his poor literacy.  (Id.)  Plaintiff
testified that he had been able to maintain employment despite
his limited literacy.  (AR 461-62.)  He stated that he received

help with job applications from his nephew or "whoever's around." (AR 461.)  He was able to bathe and dress himself without assistance and prepare meals for himself.  (AR 449-50.) Plaintiff did not have a driver's license at the time of the hearing because it was suspended for reasons unrelated to his alleged impairments, he had not sought to renew his license, and his inability legally to drive had not prevented him from maintaining employment.  (AR 450-51.)

Plaintiff stated that he was convicted of selling methamphetamine and incarcerated from 2005 until November 2009. (AR 452-53.)  He testified that he had not used the drug since 2005.  (Id.)  He did not work while incarcerated because of his health issues – specifically, his poorly controlled diabetes, stomach problems, and fatigue.  (AR 454.)  Plaintiff testified that while incarcerated, he took medication to treat his stomach, control vomiting, and treat fatigue.  (AR 455.)  He testified that he also took Neurontin for the pain in his feet.  (Id.) Plaintiff also confirmed that he has been taking blood-pressure medication "all along"; it is unclear from the transcript when such medication first was prescribed.  (AR 456.)

Plaintiff testified that he previously worked as a laborer. (AR 442.)  He stated that he began working for a company that pours cement forms while living in a halfway house following his incarceration.  (AR 453-54.)  He testified that he was terminated after about a month when he lost consciousness because of an imbalance in blood sugar.  (AR 441.)  He confirmed that he had looked for a variety of work since his release from prison, including gardening and carpentry work.  (AR 454.)

Plaintiff stated that his peripheral neuropathy caused him to be unable to feel his feet, which he testified are "just numb all the time," extending to his knees.  (AR 456.)  He stated that he also suffered from buzzing, tingling, and sharp pains in his feet and lower legs.  (AR 456-57.)  When asked how the problem with his feet affected his ability to work, Plaintiff stated that "I can't feel my feet to walk half the time" and confirmed that he had stumbled "a couple of times."  (AR 457.)  Plaintiff testified that he had never used a cane or walker, although when asked whether he had ever used "[a]ny other device to assist you walking," Plaintiff stated, "I guess I have a couple of times because . . . every now and then it's so numb that . . . I stumble."  (Id.)

Plaintiff testified that his diabetes interfered with his ability to work by causing bouts of nausea every three to four days and uncontrolled vomiting approximately every three months, requiring a visit to the hospital.  (AR 457-58.)  Plaintiff stated that he was often able to stifle uncontrolled vomiting by regulating his blood sugar.  (AR 458.)  Plaintiff further testified that he suffered from near-constant fatigue that required him to lie down once or twice a day.  (AR 459-60.)

Dr. Samuel Landau, a physician board-certified in both internal medicine and cardiovascular disease, appeared at the hearing as a medical expert.  (AR 435.)  Dr. Landau testified that Plaintiff's medically determinable impairments included "poorly controlled diabetes mellitus," gastritis, esophagitis, and right renal calculus.  (AR 462.)  He stated that Plaintiff's ailments did not meet a Listing.  (AR 464.)  Dr. Landau noted

23

that although Plaintiff testified to hospitalization
approximately every three months, the record reflected less
frequent hospitalization.  (Id.)

Dr. Landau opined that Plaintiff's diabetes would impose
some limitations upon his capacity to work.  He testified that
Plaintiff would be able to stand, walk, or sit for six hours each
in an eight-hour day and would require breaks every two hours.
(AR 466.)  He stated that Plaintiff could lift and carry 25
pounds frequently and 50 pounds occasionally.  (Id.)  He
testified that Plaintiff could climb stairs but not ladders and
should not work at heights or in situations requiring him to
balance.  (Id.)  He stated that Plaintiff should work in a
temperature-controlled environment.  (Id.)

Dr. Landau confirmed that the nausea and vomiting from which
Plaintiff had suffered were consistent with his poorly controlled
diabetes mellitus but that Plaintiff "also has underlying
digestive diseases in addition to that."  (AR 467-68.)

He testified that he did not find any "objective evidence of
peripheral neuropathy" in Plaintiff's medical records.  (AR 466.)
He believed the diagnoses of peripheral neuropathy in the record
were based on symptoms alone, without objective testing.  (AR
467.)  Dr. Landau stated that to establish such a diagnosis, an
examination must be performed to establish "abnormalities" such
as "sensory abnormalities, dependent reflex changes, vibratory
sense change, weakness, atrophy."  (AR 466-67.)  He noted that
"electrodiagnostic studies" exist to confirm such a diagnosis but
none had been performed on Plaintiff.  (AR 467.)

Dr. Landau found no support in Plaintiff's medical record

24

for Plaintiff's claim that his medical impairments prevented him from maintaining full-time employment. (AR 468.) He noted that the record reflected four hospitalizations for treatment of Plaintiff's diabetes but stated, "[W]hy the diabetes control is so poor, I can't tell you." (AR 469.)

D. <u>ALJ's Decision</u>

In her August 5, 2011 decision, the ALJ found that Plaintiff had severe impairments of poorly controlled diabetes mellitus, gastritis, and esophagitis. (AR 14.) She found that peripheral neuropathy was not a medically determinable impairment "due to a lack of objective evidence," citing Dr. Landau's testimony. (<u>Id.</u>)

The ALJ determined that Plaintiff retained the RFC to perform "less than a full range of light work."[33]  (<u>Id.</u>)

> Specifically, the claimant can lift and/or carry ten pounds frequently and twenty pounds occasionally; he can stand and/or walk six hours, sit two hours in an eight hour workday; the claimant cannot climb ladders, ropes, or scaffolds or work at unprotected heights; and the claimant must avoid concentrated exposure to extreme cold, extreme heat, and extreme weather.

(<u>Id.</u>) In so finding, the ALJ considered all of Plaintiff's

___

[33]   "Light work" involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." § 416.967(b). "Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." <u>Id.</u> "To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities." <u>Id.</u>

symptoms and found his "allegations not fully credible" to the
extent his alleged limitations were inconsistent with both his
own testimony about his activities and the medical evidence of
record.  (AR 15-16.)

     The ALJ "assigned significant, but not great, weight" to Dr.
Landau's testimony in determining Plaintiff's RFC.  (AR 17.)  As
the ALJ noted, Dr. Landau "is board-certified in internal
medicine and cardiovascular disease, he has an awareness of all
the medical evidence in the record, and he understands Social
Security disability programs and requirements."  (Id.)  The ALJ
found more restricted functional limitations than those assessed
by Dr. Landau, based in part upon Plaintiff's subjective
complaints.  (AR 18.)  The ALJ also "accorded some, but not
significant, weight" to the findings of the state medical
consultants.  (Id.)  She found that "[a]dditional evidence added
to the record after [their RFC] determination, including the
claimant's hearing testimony, establishes the presence of more
restrictive limitations" than those assessed by the medical
consultants.  (Id.)

     The ALJ found that Plaintiff's RFC was insufficient to
enable him to perform his past relevant work.  (AR 18-19.)  Given
Plaintiff's age, education, work experience, and RFC, she found
that jobs "exist[ed] in significant numbers in the national
economy that the claimant can perform."  (AR 19.)  The ALJ
therefore held that Plaintiff was not under a disability from the
amended alleged onset date of February 3, 2010, through the date
of her decision.  (AR 20.)

**VI.   DISCUSSION**

Plaintiff alleges that the ALJ erred in evaluating (1) the medical evidence of record, specifically, his diagnosis of peripheral neuropathy,[34] and (2) Plaintiff's credibility.  (J. Stip. at 4.)  Neither of these contentions warrants reversal.

A.   <u>The ALJ Properly Evaluated the Medical Evidence</u>

Plaintiff contends that the ALJ erred in finding that Plaintiff failed to establish a severe medically determinable impairment of peripheral neuropathy.  (J. Stip. at 7.)  As a result, Plaintiff argues, the ALJ erred in finding that Plaintiff retained the RFC to perform less than a full range of light work.  (<u>Id.</u>)  Reversal is not warranted.

1.   <u>The ALJ did not err in finding that the medical evidence failed to establish a severe, medically determinable impairment of peripheral neuropathy</u>

Plaintiff argues that the ALJ "failed to properly consider Plaintiff's diabetic neuropathy."  (J. Stip. at 4.)  Plaintiff maintains that the medical record provides objective evidence supporting a diagnosis of peripheral neuropathy and the ALJ erred in accepting Dr. Landau's testimony to the contrary.  (J. Stip. at 6-7.)

a.   *Applicable Law*

At step two of the sequential evaluation process, the claimant has the burden to show that he has one or more "severe" medically determinable impairments that can be expected to result

---

[34]   Plaintiff does not argue that the ALJ erred in finding him not disabled based on the impairments she found to be medically determinable.

1  in death or last for a continuous period of at least 12 months.

2  See Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S. Ct. 2287,

3  2294 n.5, 96 L. Ed. 2d 119 (1987) (claimant bears burden at step

4  two); Celaya v. Halter, 332 F.3d 1177, 1180 (9th Cir. 2003)

5  (same); 20 C.F.R. §§ 416.908 (defining "physical or mental

6  impairment"), 416.920(a)(4)(ii) (claimants will be found not

7  disabled at step two if they "do not have a severe medically

8  determinable physical or mental impairment that meets the

9  duration requirement").  A medically determinable impairment must

10 be established by signs, symptoms, or laboratory findings; it

11 cannot be established based solely on a claimant's own statement

12 of his symptoms. § 416.908; Ukolov v. Barnhart, 420 F.3d 1002,

13 1004-05 (9th Cir. 2005); SSR 96-4p, 1996 WL 374187, at *1 (July

14 2, 1996); see also 42 U.S.C. § 423(d)(3) ("physical or mental

15 impairment" is one that "results from anatomical, physiological,

16 or psychological abnormalities which are demonstrable by

17 medically acceptable clinical and laboratory diagnostic

18 techniques").  A "medical sign" is "an anatomical, physiological,

19 or psychological abnormality that can be shown by medically

20 acceptable clinical diagnostic techniques."  Ukolov, 420 F.3d at

21 1005 (quoting SSR 96-4p, 1996 WL 374187, at *1 n.2 (July 2, 1996)

22 (internal quotation marks omitted)); accord 20 C.F.R.

23 § 416.928(b).

24      To establish that a medically determinable impairment is

25 "severe," moreover, the claimant must show that it "significantly

26 limits [his] physical or mental ability to do basic work

27

28

activities."[35]   § 416.920(c); accord § 416.921(a).   "An

impairment or combination of impairments may be found not severe

only if the evidence establishes a slight abnormality that has no

more than a minimal effect on an individual's ability to work."

Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005) (emphasis in

original, internal quotation marks omitted); see also Smolen v.

Chater, 80 F.3d 1273, 1290 (9th Cir. 1996) ("[T]he step-two

inquiry is a de minimis screening device to dispose of groundless

claims.").   Applying the applicable standard of review to the

requirements of step two, a court must determine whether an ALJ

had substantial evidence to find that the medical evidence

clearly established that the claimant did not have a medically

severe impairment or combination of impairments.   Webb, 433 F.3d

at 687.

          b.   *Analysis*

     Plaintiff has failed to meet his burden to present evidence

of medical signs, symptoms, and laboratory findings establishing

his alleged peripheral neuropathy as a medically determinable

impairment.   Plaintiff points to five "Progress Notes" that

document consultations by Dr. Seneviratne and a physician

assistant regarding Plaintiff's diabetes and related ailments,

including peripheral neuropathy. (J. Stip. at 5.)   Although the

---

[35]     "Basic work activities" include, among other things,
"[p]hysical functions such as walking, standing, sitting,
lifting, pushing, pulling, reaching, carrying, or handling";
"[c]apacities for seeing, hearing, and speaking";
[u]nderstanding, carrying out, and remembering simple
instructions"; using judgment; "[r]esponding appropriately to
supervision, co-workers and usual work situations"; and
"[d]ealing with changes in a routine work setting."   20 C.F.R. §
416.921(b); accord Yuckert, 482 U.S. at 141.

notes in each case reference peripheral neuropathy or treatment
with Neurontin, none indicate the completion of any medically
accepted diagnostic test to confirm the diagnosis. (See Ex. 5F
at 1, 2; AR 262, 350, 354.)  Rather, these records appear merely
to record Plaintiff's complained-of symptoms of pain and
numbness.  Symptoms alone are insufficient to establish a
medically determinable impairment.  See Ukolov, 420 F.3d at 1005-
06 (treating physician's notation of balance problems, dizziness,
problems with "sustained ambulation," and increased tendency to
fall did not support finding of impairment because they were
based "solely" on plaintiff's own "perception or description of
his problems" (internal quotation marks omitted)); 20 C.F.R. §
416.908 ("A physical or mental impairment must be established by
medical evidence consisting of signs, symptoms, and laboratory
findings, not only by your statement of symptoms."); SSR 96-4p,
1996 WL 374187, at *1 (July 2, 1996) ("[R]egardless of how many
symptoms an individual alleges, or how genuine the individual's
complaints appear to be, the existence of a medically
determinable physical or mental impairment cannot be established
in the absence of objective medical abnormalities; i.e., medical
signs and laboratory findings.").

    Diagnosis of peripheral neuropathy is "difficult" and
generally requires "[a] thorough neurological examination,"
"extensive patient history," tests to identify the cause of the
disorder, and tests to determine the extent and type of nerve
damage.  See Peripheral Neuropathy Fact Sheet, Nat'l Inst. of
Neurological Disorders & Stroke, http://www.ninds.nih.gov/
disorders/peripheralneuropathy/detail_peripheralneuropathy.htm

1  (last updated Sept. 19, 2012); (see also AR 466-67 (Dr. Landau
2  noting that diagnosis requires examination to establish
3  "abnormalities" such as "sensory abnormalities, dependent reflex
4  changes, vibratory sense change, weakness, atrophy")).  Further
5  testing is sometimes required to determine the nature and extent
6  of the neuropathy.  See Peripheral Neuropathy Fact Sheet, supra;
7  (see also AR 467.)  Nothing in the record indicates that Dr.
8  Seneviratne – or any other doctor – ever conducted a "thorough
9  neurological examination" or performed any tests on Plaintiff at
10 all, much less sufficient to diagnose peripheral neuropathy.  The
11 only even arguable medical signs in the record supporting the
12 diagnosis are brief notations on March 15, 2010, and May 4, 2011,
13 that Plaintiff had decreased sensation in his feet and a November
14 10, 2010 notation that his feet were cold.  But Plaintiff's
15 hospital records of the same general time frame belie these
16 conclusory observations, which may well simply be notations of
17 Plaintiff's subjective symptoms.  In June 2010, the hospital
18 noted that he was not at risk of falling, had no focal deficit,
19 and had "fairly well preserved" motor tone.  (AR 361, 366.)  He
20 also had no cyanosis of the extremities.  (AR 371.)  In March
21 2011, the hospital noted once again that he had no cyanosis of
22 the extremities.  (AR 401.)  Further, Plaintiff's original
23 diagnosis of peripheral neuropathy came from a physician
24 assistant, not a medically acceptable source.  See Molina v.
25 Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012) (physician assistants
26 are not "[a]cceptable medical sources" (alteration in original,
27 internal quotation marks omitted)); Thornton v. Astrue,
28 CV-09-0138-CI, 2010 WL 1904661, at *5 (E.D. Wash. May 12, 2010)

31

(noting that physician assistant's opinion cannot establish medically determinable impairment (citing 20 C.F.R. § 416.913(d); SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006))).

Nor is there any other evidence in the record of a diagnosis of peripheral neuropathy based upon medically acceptable diagnostic techniques.  Although Plaintiff testified that he has taken Neurontin since he was incarcerated in 2005 (AR 455; see also AR 451), the only references to peripheral neuropathy in the record are the more recent ones discussed above.  Moreover, Neurontin is used to treat other ailments, including restless-legs syndrome.  See Gabapentin, MedlinePlus, http://www.nlm.nih. gov/medlineplus/druginfo/meds/a694007.html (last updated July 15, 2011).

Further, to the extent the ALJ relied upon Dr. Landau's testimony that the medical record contained no objective evidence of peripheral neuropathy, that testimony was consistent with the medical record and the ALJ was entitled to rely upon it.  See Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2001) ("The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record."); Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999) ("Opinions of a nonexamining, testifying medical advisor may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it" (citing Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995))); 20 C.F.R. § 416.927(c)(4) (ALJ will generally give more weight to opinions that are "more consistent . . . with the

record as a whole"). Moreover, the ALJ could credit Dr. Landau's opinion because he testified at the hearing and was subject to cross-examination. See Andrews, 53 F.3d at 1042 (greater weight may be given to nonexamining doctors who are subject to cross-examination). Any conflict in the properly supported medical-opinion evidence was therefore the sole province of the ALJ to resolve. See id. at 1041.

Because the record does not reflect diagnosis of Plaintiff's alleged peripheral neuropathy by medically acceptable clinical and laboratory diagnostic techniques, the ALJ did not err in holding that the record lacked objective evidence sufficient to establish a medically determinable impairment of peripheral neuropathy. (AR 14); see Ukolov, 420 F.3d at 1005-06; 42 U.S.C. § 423(d)(3) ("[A] 'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."); see also 20 C.F.R. § 416.928(a)-(c); Ball v. Massanari, 254 F.3d 817, 823 (9th Cir. 2001) ("[I]f the claimant's ailment does not pass step 2, . . . it is not disabling.").

2.   The ALJ did not err in determining Plaintiff's RFC

Plaintiff argues that the ALJ's RFC finding was in error because it excluded limitations related to Plaintiff's peripheral neuropathy, including that he "could not stand/walk for 6 of 8 hours" and required unscheduled work breaks that would preclude full-time competitive employment. (J. Stip. at 7.)

As explained above, the ALJ did not err in holding that Plaintiff failed to establish peripheral neuropathy as a

medically determinable impairment.  The lack of objective medical evidence of peripheral neuropathy excludes its consideration in the determination of Plaintiff's RFC.[36]  See McLavey v. Astrue, 325 F. App'x 593, 594 (9th Cir. 2009) ("A claimant's RFC must take into account 'only limitations and restrictions attributable to medically determinable impairments.'" (citing SSR 96-8P, 1996 WL 374184 (July 2, 1996))); Allison v. Astrue, 425 F. App'x 636, 639 (9th Cir. 2011) (same); Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005) ("Preparing a function-by-function analysis for medical conditions or impairments that the ALJ found neither credible nor supported by the record is unnecessary.").  Accordingly, Plaintiff is not entitled to relief on this claim.

     B.   The ALJ Properly Evaluated Plaintiff's Credibility

     Plaintiff argues that the ALJ failed to provide clear and convincing reasons for discrediting portions of Plaintiff's testimony.  (J. Stip. at 11.)  Plaintiff asserts that the ALJ was not permitted to discredit Plaintiff's testimony solely because it was unsupported by objective medical evidence.  (Id. at 12.)

---

[36]   Further, even if Plaintiff had presented objective evidence of peripheral neuropathy, the ALJ properly found that Plaintiff received only routine, conservative treatment for the alleged ailment (AR 16), implying that any symptoms were adequately controlled with medication.  See 20 C.F.R. § 416.929(c)(3)(iv)-(v) (ALJ may consider effectiveness of medication in evaluating severity and limiting effects of impairment); Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for [Social Security] benefits.").  No evidence in the record supported more restrictive functional limitations than the ALJ assessed.  (AR 16); cf. Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007) (step-two error harmless when ALJ accounts for resulting limitations later in sequential evaluation process.)

1  Plaintiff disputes the ALJ's assessment that his testimony

2  reflected "somewhat normal" daily activities.  (Id. at 13.)

3  Reversal is not warranted on these grounds.

4     An ALJ's assessment of pain severity and claimant

5  credibility is entitled to "great weight."  See Weetman v.

6  Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779

7  F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to

8  believe every allegation of disabling pain, or else disability

9  benefits would be available for the asking, a result plainly

10  contrary to 42 U.S.C. § 423(d)(5)(A)."  Molina, 674 F.3d at 1112.

11  In evaluating a claimant's subjective symptom testimony, the ALJ

12  engages in a two-step analysis.  See Lingenfelter, 504 F.3d at

13  1035-36.  "First, the ALJ must determine whether the claimant has

14  presented objective medical evidence of an underlying impairment

15  [that] could reasonably be expected to produce the pain or other

16  symptoms alleged."  Id. at 1036 (internal quotation marks

17  omitted).  If such objective medical evidence exists, the ALJ may

18  not reject a claimant's testimony "simply because there is no

19  showing that the impairment can reasonably produce the degree of

20  symptom alleged."  Smolen, 80 F.3d at 1282 (emphasis in

21  original).  When the ALJ finds a claimant's subjective complaints

22  not credible, the ALJ must make specific findings that support

23  the conclusion.  See Berry v. Astrue, 622 F.3d 1228, 1234 (9th

24  Cir. 2010).  Absent affirmative evidence of malingering, those

25  findings must provide "clear and convincing" reasons for

26  rejecting the claimant's testimony.  Lester, 81 F.3d at 834.  If

27  the ALJ's credibility finding is supported by substantial

28  evidence in the record, the reviewing court "may not engage in

35

1  second-guessing."   Thomas, 278 F.3d at 959.

2       Reversal is not warranted based on the ALJ's alleged failure

3  to make proper credibility findings or properly consider

4  Plaintiff's subjective symptoms.   As discussed above, the ALJ's

5  evaluation of the medical evidence was consistent with the

6  record; her rejection of Plaintiff's testimony to the extent it

7  was inconsistent with the objective evidence was therefore

8  proper.   See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d

9  1155, 1161 (9th Cir. 2008) ("Contradiction with the medical

10 record is a sufficient basis for rejecting the claimant's

11 subjective testimony."); Lingenfelter, 504 F.3d at 1040 (in

12 determining credibility, ALJ may consider "whether the alleged

13 symptoms are consistent with the medical evidence").   Although

14 Plaintiff is correct that the ALJ was not permitted to rely on a

15 lack of objective medical evidence "alone" to discredit

16 Plaintiff's testimony (J. Stip. at 12), here the ALJ properly

17 considered it as one factor in her evaluation.   See Burch v.

18 Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of

19 medical evidence cannot form the sole basis for discounting pain

20 testimony, it is a factor that the ALJ can consider in his

21 credibility analysis."); Kennelly v. Astrue, 313 F. App'x 977,

22 979 (9th Cir. 2009) (ALJ may not disregard testimony "solely"

23 because it was unsubstantiated by medical evidence but "may use

24 the medical evidence . . . as one factor in his evaluation").

25       The ALJ specifically identified various inconsistencies

26 between Plaintiff's testimony and the objective medical evidence

27 of his ailments.   She found that although Plaintiff testified

28 that he visited the emergency room every three months (AR 457),

the medical records revealed less frequent medical interventions (AR 16).   The ALJ noted that although Plaintiff testified that peripheral neuropathy affected his ability to work because it interfered with his walking, causing sharp pain, tingling, and numbness that made him stumble, Plaintiff confirmed that he did not use a cane or walker.  (AR 15.)   Indeed, the hospitals repeatedly found that he was not at risk of falling.  (AR 231, 361.)   The ALJ also noted that Plaintiff's complaints of vision problems were unsupported by the medical evidence in the record, a finding Plaintiff does not challenge.  (AR 16.)   Indeed, as the ALJ noted, "there is no medical source statement from an examining or treating physician that endorses the extent of Plaintiff's alleged functional limitations."  (Id.)   The ALJ thus properly discounted Plaintiff's statements because they either were not supported by or were contradicted by the record.  Carmickle, 533 F.3d at 1161; Lingenfelter, 504 F.3d at 1040.

Moreover, as the ALJ noted, Plaintiff testified that he was able to do basic daily activities, including maintaining personal hygiene, dressing himself, and cooking.  (AR 15.)   She noted Plaintiff's testimony that he was able to apply for jobs with the help of his nephew and others.  (Id.)   During the hearing the ALJ observed that one of Plaintiff's hospitalizations occurred after he got overheated while "working outside" on a hot day, further indicating that he was not as impaired as he claimed.  (AR 460.) The ALJ also noted that Plaintiff's lack of a driver's license was not due to health issues but to a suspension that Plaintiff had chosen not to remedy.  (AR 15-16.)   That Plaintiff's allegations of disabling functional limitations were inconsistent

with evidence in the record as to his daily activities was a valid reason for the ALJ to discount his testimony.  See Molina, 674 F.3d at 1113 ("Even where [claimant's] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment."); see also Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989) ("[I]f, despite his claims of pain, a claimant is able to perform household chores and other activities that involve many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent the claimant from working.").

Finally, the ALJ properly found that Plaintiff "received only routine, conservative treatment for poorly controlled diabetes mellitus, treated gastritis, and esophagitis." (AR 16); see 20 C.F.R. § 416.929(c)(3)(iv)-(v) (ALJ may consider effectiveness of medication and nature of treatment in evaluating severity and limiting effects of impairment).  Indeed, although the record reflected three hospital visits since the amended alleged onset date, in each case Plaintiff was successfully treated and discharged with medication, dietary instructions, and a recommendation that he follow up with his regular medical provider.  (See AR 281, 301, 423.)  His diabetes, gastrointestinal ailments, and alleged peripheral neuropathy were otherwise managed with visits to Dr. Seneviratne's clinic, where his medications were renewed or adjusted and he was encouraged to augment his diet and test his blood sugar twice daily.  (See 5F at 1-2; AR 261, 352.)

1   Because the ALJ gave clear and convincing reasons for her

2   credibility finding and those reasons were supported by

3   substantial evidence, the Court "may not engage in

4   second-guessing." Thomas, 278 F.3d at 959.  Plaintiff is not

5   entitled to reversal on this claim.

6   **VII. CONCLUSION**

7   Consistent with the foregoing, and pursuant to sentence four

8   of 42 U.S.C. § 405(g),[37] IT IS ORDERED that judgment be entered

9   AFFIRMING the decision of the Commissioner and dismissing this

10  action with prejudice.  IT IS FURTHER ORDERED that the Clerk

11  serve copies of this Order and the Judgment on counsel for both

12  parties.

15  DATED: November 8, 2013

    _____
    JEAN ROSENBLUTH
    U.S. Magistrate Judge

---

26  [37]    This sentence provides: "The [district] court shall
27  have power to enter, upon the pleadings and transcript of the
    record, a judgment affirming, modifying, or reversing the
28  decision of the Commissioner of Social Security, with or without
    remanding the cause for a rehearing."